STATE *EX REL*. VANDIVER v. TOLLY.

1. MUNICIPAL DEBT—CONSTITUTIONAL LIMIT—ASSESSMENT.—Under the constitutional provision forbidding a bonded debt by a municipality in excess of "eight per centum of the assessed value of all the taxable property therein," the valuation of its property is to be ascertained by the regular assessment, made under the forms of law, for the ordinary purposes of taxation, and cannot be fixed by a special assessment made with a view of issuing a particular bonded debt. And the debt created cannot exceed eight per cent. of the regular assessed valuation.

2. IBID.—IBID.—IBID.—And yet again, where a regular mode of assessing property by a municipality, for purposes of municipal taxation, is fixed by statute, none other can be pursued by the corporation, and an assessment made at another time by a different board, under resolution of the municipal council, was unauthorized and void.

3. IBID.—REPEAL OF STATUTE.—Repeals by implication are not favored; and, therefore, an act which prohibited a bonded debt by a city in excess of $50,000, or until approved by an election of the voters, to be ordered after a petition to the city council, signed by a majority of the owners of real estate, was not repealed, except as to the amount of the debt limited, by a subsequent act, which, after reciting that the city council of such city, pursuant to written request of a large majority of the taxpayers and the real estate owners of said city, was desirous of submitting a bid of not exceeding $100,000 for the location of a school and of making good such subscription, and proposed to issue coupon bonds for such purpose, provided that the said city council was "authorized and empowered" to subscribe, not exceeding $100,000, and to issue coupon bonds of the city in payment. Therefore, the issue of the bonds *authorized* by the later act, to the limit therein stated, could only be made after a compliance with the preliminary conditions prescribed in the older act.

MR. JUSTICE POPE *dissenting*.

This was a proceeding in the name of the State, on the relation of J. R. Vandiver and others, taxpayers of the city of Anderson, against G. F. Tolly, as mayor of said city, asking this court to grant its writ of mandamus to compel the issue of certain municipal bonds. To the facts, as stated in the opinion, it will be convenient here to add that the bonds originally issued by the city of Anderson in aid of the Savannah Valley Railroad, were authorized in 1882 and 1883 (18 Stat., 225, 663), which was prior to the date of the constitutional amendment

of December, 1884, limiting the amount of bonded debt "hereafter incurred by any municipal corporation." 18 Stat., 690. But see 18 Stat., 755.

*Messrs. Tribble & Prince,* for relators.

*Messrs. Murray & Murray* and *B. F. Whitner,* contra.

November 18, 1892. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. This is a petition, addressed to this court, in the exercise of its original jurisdiction, praying that a writ of mandamus may issue, requiring the respondent, as mayor of the city of Anderson, South Carolina, to sign and issue bonds of the said city to the amount of one hundred and eleven thousand dollars, thirty-six thousand dollars of which to be used in retiring that amount of bonds still outstanding, heretofore issued by said city in aid of the construction of the Savannah Valley Railroad, and the remaining seventy-five thousand dollars to be used in paying the subscription of said city to the South Carolina Industrial and Winthrop Normal School, proposed to be established within the corporate limits of said city. The respondent, in his return to the rule to show cause why the writ demanded should not issue, states three objections: 1st. That the amount of bonds which it is sought to require him to issue, exceeds the constitutional limit of eight per cent. of the assessed value of all the taxable property in said city. 2d. That there has been no vote taken in favor of the issue of such bonds, as required by the charter of the city. 3d. That the purpose for which seventy-five thousand dollars of the bonds are to be used is not a corporate purpose.

The return has not been traversed, and, therefore, the facts stated therein must be accepted as true. It is there stated that the total amount of property assessed for taxation in said city, as appearing on the tax books of the city for the year 1892, made up from the returns of personal property by individuals for taxation, during the month of January, 1892, and the assessments of real estate made by the persons appointed for

that purpose during the same month, was $1,305,885, eight
per cent. of which would be less than the amount of bonds pro-
posed to be issued.    It is also stated in the return that, after
the city council had, on the 7th March, 1892, passed a resolu-
tion authorizing and directing the mayor to subscribe, in bonds,
the sum of seventy-five thousand dollars for the South Carolina
Industrial and Winthrop Normal School, another resolution
was passed on the 24th of March, 1892, appointing a commit-
tee of three gentlemen "to ascertain and report to the city
council the amount and assessed value of all taxable property
in said city on the 7th day of March, 1892, the date of said
subscription, and the said board of assessors are hereby directed
to add to the list of taxable property in said city any property
that has been omitted for the year commencing January 1st,
1892."

On the next day this committee reported to the city council:
"That they have carefully examined the city's tax books, which
were made up from returns of personal property by individuals
for taxation during the month of January last (1892), and the
assessments of real estate made by the committee heretofore
appointed by you in said month. We find from said books that
the assessed value of all property for taxation under your ordi-
nance at that time was the sum of $1,305,885." The committee
also add that they find other property, specified in their report,
which has been by ordinance temporarily exempted from taxa-
tion for city purposes, as well as certain additional bank stock
paid up since the 1st of January, 1892, upon which they place
a value aggregating in the whole the sum of $214,000, which,
added to the amount appearing on the city's tax books, will, in
their opinion, make the total value of all the taxable property
in the city on the 7th of March, 1892, the sum of $1,520,385;
and as eight per cent. of this last named amount is more than
the amount of the bonds which it is now proposed to issue, it
is very obvious that the material inquiry is, whether the
amount last named can be accepted as the assessed value of all
the taxable property in the city of Anderson, or whether the
amount appearing on the tax books of the city must be taken
as such assessed value.

67—37

The constitutional provision, under which this controversy arises, may be found in 18 Statutes, 689, and it reads as follows: "Any bonded debt hereafter incurred by any county, municipal corporation, or political division of this State, shall never exceed eight per centum of the assessed value of all the taxable property therein." The manifest object of this provision was to limit the power of these subordinate branches of the government to contract debts; and, like most constitutional limitations, its purpose was to protect minorities by depriving a mere majority of the power to impose what might prove to be grievous burdens upon the property of such taxpayers as might be in the minority. As debts of this character are to be paid by taxation, it was quite natural that, in fixing a limit, reference should be had to the value of the taxable property from which it was to be paid; but, as it would be essential to justice and fair dealing that the mode of ascertaining the value of the taxable property should not be left to the mere arbitrary will of those who might happen to have the controlling power, but should be defined by some rule equally applicable to all, it would seem that none better could be devised than by resorting to the value as ascertained by an assessment made for the purpose of taxation, in which all would be alike interested. Accordingly, we find that the language used in the constitutional provision is, *not* "eight per centum" of the *actual*, or *real*, or *market* value of the taxable property, but the language is, "of the *assessed* value of all the taxable property therein." .

This word, "assessed," has, and had at the time of the adoption of the constitutional provision now under consideration, a well defined meaning, when applied to taxable property, and the framers of that provision must be assumed to have used it in the same sense in which it was used in the various acts of the legislature relating to the subject of taxation. It must be regarded as meaning the value placed upon property for the purpose of taxation by officials appointed for that purpose. It certainly cannot properly be construed as meaning a mere estimate placed upon the value of the taxable property of a given corporation, perhaps by persons so blinded by a desire to em-

bark in an enterprise which involves the contracting of a debt
as to induce them to over-estimate the value of such property,
for the purpose of promoting a scheme which they honestly
believed would prove of great benefit to the corporation. Such
a view would completely destroy, or at least greatly impair,
the efficiency of the constitutional provision. Of course, we
are not to be understood as saying, or even intimating, that, in
this particular case, the persons selected to ascertain the value
of the taxable property in the city of Anderson were actuated
by any desire to evade the constitutional provision, or that
their anxiety to promote a most worthy and laudable enter-
prise induced them to make an over-estimate. On the contrary,
their report shows a spirit of fairness, and, no doubt, was the
result of their honest judgment. But, in giving a construction
to a constitutional provision such as this, courts are not to be
influenced either by the fair or unfair conduct of particular
individuals in a given case, but must look to general results.
So regarding this constitutional provision, we cannot so con-
strue it as would put it in the power of individuals to evade
its real intention, and thus greatly impair, if not destroy, its
efficiency.

But, again, the city council of Anderson has no powers ex-
cept such as are conferred upon it by the charter of the city.
It has no power to inquire into or ascertain legally the
assessed value of the taxable property in the city of
Anderson, except such as it has been invested with by
the charter; and that is simply a power to have all the taxable
property in said city assessed for the purposes of taxation,
which power must be exercised strictly in conformity to the
mode prescribed in the charter. As is said in Cooley on Tax-
ation, after speaking of the importance of an assessment: "It
is, therefore, not only indispensable, but in making it, the pro-
visions of the statute under which it is to be made, must be
observed with particularity." Now, by the charter of the city
of Anderson, as amended by the act of 1884 (18 Stat., 813), the
city council is empowered to impose an annual tax on real and
personal property, lying and held within the corporate limits :
"and for that purpose they shall appoint three freeholders resid-

ing therein to assess the value of the said real estate upon oath, and return the assessment within one month to said council for taxation." And by section 12 of the original charter (A. A. 1882, 17 Stat., 979), the clerk of the city council is required, "in the assessment of all property in said city," to furnish each taxpayer with "a printed form or statement of return for taxation," and to receive from each taxpayer "the statement of his property for taxation required by this act," and in case of the failure of the taxpayer to furnish such return within the time prescribed, "he shall be assessed and returned by said clerk." These returns are required to be made of all property, other than real estate, "during the month of January in each year."

From these statutory provisions it is obvious that the only assessment of the taxable property which the city council is empowered to make is an *annual* assessment, and it is not empowered to make any other or additional assessment. Now, in this case it appears that, in pursuance of these statutory provisions, the city council did make an assessment of the taxable property within the corporate limits of the city during the month of January, 1892, which was duly entered upon the books of the city treasurer. Hence the so-called subsequent assessment or estimate of the value of the taxable property in the city, made by a committee of three gentlemen, on the 24th of March, 1892, after the subscription to the industrial school, for the very purpose of showing that the amount subscribed, added to the outstanding debt of the city, would not create a debt exceeding in amount the constitutional limit, was wholly unauthorized and void.

Again, it is contended by the respondent that the bonds which he is called upon to issue, cannot be legally issued, because the same has never been authorized by any vote of the majority of the qualified electors of said city. By the amended charter of the city (act of 1884, 18 Stat., 814), the city council is invested with power to contract a debt by issuing bonds; but this is not an unlimited or unconditional power, and, on the contrary, is conferred, provided certain conditions shall be complied with: 1st. That the amount of the

debt shall not at any time exceed the sum of fifty thousand dollars. 2d. That the property of the inhabitants of the city shall only be subjected to the payment of such debt through the medium of taxation. 3d. That a majority of the qualified electors of said city shall first vote in favor of issuing said bonds, at an election to be held for that purpose, of which the city council shall give at least fifteen days previous public notice. 4th. That a majority of the owners of real estate in said city shall first petition said city council to order said election. It being conceded that no such election has been held in this case, it is very obvious that, under these provisions, the bonds in question cannot be legally issued.

It is contended, however, that by the act of 1891 (20 Stat., 1217), the city council of Anderson is specially authorized to issue the bonds in question, and hence the restrictions upon the power of the city council to issue bonds, contained in the amended charter of the city above mentioned, are necessarily abrogated by this subsequent act. In the preamble to that act it is said: "*Whereas,* the city of Anderson, by the mayor and aldermen of said city, pursuant to the written request of a large majority of the taxpayers and real estate owners of said city, is desirous of submitting a bid of not less than seventy-five thousand dollars nor more than one hundred thousand dollars, for securing the location and establishment of 'The South Carolina Industrial and Winthrop Normal College' in said city ; *and whereas,* the said city of Anderson is desirous of making good such subscription, * * * and for that purpose proposes to issue coupon bonds in a sufficient amount to make good such subscription," &c. The act then proceeds, in its first section, to authorize and empower the city council to subscribe a sum not exceeding one hundred thousand dollars to the institution above named; and in its second section the city council is "authorized and empowered" to issue the requisite amount of bonds for the purpose of making good such subscription; and in the last section it is declared, "that all acts and parts of acts inconsistent with the provisions of this act be, and they are hereby, repealed."

It will be observed that there is no express repeal of the

provisions of the charter above cited as to the manner in which the corporation may contract a debt, but it is contended that this provision is repealed by implication, as the provisions of the last act are wholly inconsistent with the former. The rule is well settled, that repeals by implication are not favored in law, and, therefore, where it is possible to reconcile apparent inconsistencies between two acts of the legislature, it is the duty of the courts to do so. It is only where the provisions of the two acts are so wholly repugnant that the two cannot stand together, that the courts are justified in applying the exceptional doctrine of repeals by implication. Potter's Dwarris on Statutes, 154–5, and cases there cited in the notes. Applying this rule to the case under consideration, we are unable to discover any such repugnancy as would justify us in holding that the act of 1891 repeals by implication the provisions of the charter above referred to. On the contrary, it seems to us that the provisions of the two acts are entirely consistent, except in one respect to be hereafter mentioned.

Inasmuch as the power of the city council had, by previous legislation, been so limited that a debt exceeding the sum of fifty thousand dollars could not be contracted, the manifest object of the act of 1891 was simply to extend that limit to the sum therein mentioned, and there is not a word in the act of 1891 inconsistent with the previous provision that no debt, no matter how small the amount, should be contracted, except by the authority of a previous vote of the qualified electors of the city, given at an election held pursuant to a request of a majority of the real estate owners. The act of 1891 simply *"authorized* and *empowered"* the city council to issue bonds to an amount exceeding the limit previously fixed, but did not *require* such issue, nor did it undertake to change the mode previously prescribed in which any debt could be contracted. There is nothing inconsistent in the two acts, so far as relates to the conditions upon which the corporation might contract a debt, except as to the limit of the amount of the debt; and to that extent, and that only, does the latter act operate a repeal of the former. As indicative of the intention of the legislature not to repeal the provisions of the charter of the city of Ander-

son so far as it required a vote of the people to incur a debt, we find in another act passed by the same legislature on the previous day, upon the same subject, that while provision was made whereby the authorities of any municipal corporation might issue bonds to make good subscriptions to "The South Carolina Industrial and Normal College," it was expressly provided that such issue of bonds shall be authorized by a vote at an election held for the purpose. See act of 1891, § 8, 20 Stat., 1105.

Surely it cannot be contended that the recital in the preamble of the act of 1891, that a petition signed by a large majority of the taxpayers and real estate owners, desired the issue of the bonds, can supersede the necessity of an election expressly required by statute. In view of the facility with which petitions may be gotten up, it would be a dangerous doctrine to hold that such a paper would deprive the voters of their constitutional right to vote *by ballot.*

The third position taken by the respondent in his return, that the debt in question was not for a corporate purpose, while not distinctly abandoned, was not pressed in the argument, and, under the view which we have taken, cannot arise.

So, too, it is unnecessary to consider the question whether the acts of the legislature and ordinances of the city temporarily exempting certain property within the corporate limits of the city from taxation, are in conflict with the Constitution, for, under our view, such question cannot arise, and hence it will not be considered.

We are of opinion, for reasons above stated, that the relators are not entitled to the writ of mandamus prayed for.

It is, therefore, the judgment of this court, that the petition be dismissed.

MR. JUSTICE McGOWAN concurred.

MR. JUSTICE POPE. I dissent, and will file a dissenting opinion.